## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STEVEN BUFFINGTON, NANCY HELMOLD, SARAH KRAMER, and CYRINDA CRAIG, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SPAY, INC. d/b/a STACK SPORTS,<br><br>Defendant. | Civil Action No. 24-cv-2541<br><br>**CLASS ACTION COMPLAINT**<br><br>**Jury Trial Demanded** |

Plaintiffs Steven Buffington, Nancy Helmold, Sarah Kramer, and Cyrinda Craig ("Plaintiffs"), on behalf of the putative Class, by their undersigned counsel, and for their Class Action Complaint against Defendant sPay, Inc. d/b/a Stack Sports, allege as follows:

### PRELIMINARY STATEMENT

1.    This is a proposed class action seeking monetary damages, restitution, and injunctive and declaratory relief from Defendant sPay, Inc. d/b/a Stack Sports ("Defendant" or "Stack Sports") arising from its deceptive and unfairly disclosed junk "Service Fee" assessed on recreational sport registrations completed via Defendant's Sports Connect software.

2.    Youth sports are an integral part of the lives of many American families, but in recent years the costs of participating in youth sports has risen steeply. One reason is that private companies have become involved in the administration of youth sports, oftentimes forcing families to pay junk fees or forgo participating in youth sports altogether.

1

3.      Stack Sports offers sports management technology services to youth sports organizations throughout the United States. As part of its service, it provides youth sports leagues with an online enrollment platform through its Sports Connect service. The Sports Connect service is paid for by the youth sports organization that seeks to use the software, and parents or guardians of youth players are then instructed that they *must* use Sports Connect service to register their children in the organization's sports offerings. Sports Connect prohibits parents or guardians from signing up in alternative manners that would allow them to avoid paying the Service Fee. Through such agreements, Sports Connect acquires a captive audience of families who have no choice but to use their services.

4.      It then imposes undisclosed, deceptive, and unfair junk fees on families who have no choice but to pay them. By this conduct, Sports Connect has engineered a "pay junk fees to play" scheme. Kids can't play their chosen youth sports unless their parents pay the junk fee unilaterally set by Defendant with zero relationship to the service actually being provided.

5.      Throughout the entirety of the youth sports enrollment process, Sports Connect displays a single price for registration for a youth sport to the parent or guardian, without any additional fee.  Reasonable consumers like Plaintiff proceed through check out without ever becoming aware of any additional fees assessed by Defendant.

6.      Then, at checkout, and only after consumers have completed a comprehensive enrollment process wherein a single price for the sport is displayed, Sports Connect surreptitiously imposes a so called "Service Fee" amounting to at least $3.00 on all orders.  The Service Fee is added very late in the registration process in order to ensure it is unseen by consumers like Plaintiff.

7.      It is false and deceptive for Defendant to surreptitiously add a "Service Fee" at the end of the enrollment process, especially where it offers no explanation of the Service Fee at any time during the checkout process. The "Service Fee" is only added without comment or description as a line item just before a purchase is completed after a multi-step process without any mention of the fee.

8.      Worse, the Service Fee itself is a sham, a classic "junk fee." The service provided by Sports Connect, which is signing up for and managing communications regarding youth sports, is a "service" that the youth sports leagues are already paying Defendant for. There is no additional service provide to parents or guardians who register. The Service Fee is merely a second payment—in the form of a junk fee—for the "Service" that the sports leagues are already paying for. Indeed, prior to 2020, Sports Connect did not charge any Service Fee, until being acquired by a new company.

9.      By hiding the mis-named and deceptive fee at the very last step of the sale, Defendant has raked in millions of dollars in Service Fees at the expense of consumers stuck with no other choice for registering their child for a sport.

10.      As a result of Defendant's unfair and deceptive conduct, Plaintiff and the proposed class have suffered damages. They purchased sports enrollments they otherwise may not have bought and paid fees they otherwise would not have paid, had they not been drawn in by Defendant's deceptive bait-and-switch scheme.

11.      Plaintiff seeks damages and, among other remedies, injunctive relief that fairly allows consumers to decide whether they will pay the so-called Service Fee.

## PARTIES

12.    Plaintiff Steven Buffington is a resident and a citizen of Middletown, New York.

13.    Plaintiff Cyrinda Craig is a resident and a citizen of Spring Hill, Florida.

14.    Plaintiff Nancy Helmold is a resident and citizen of Chicago, Illinois.

15.    Plaintiff Sarah Kramer is a resident and citizen of Sergeant Bluff, Iowa.

16.    Defendant sPay, Inc. d/b/a Stack Sports is a software provider for various sports leagues throughout the United States, including youth sports organizations. It is headquartered in Frisco, Texas.

## JURISDICTION AND VENUE

17.    This Court has original jurisdiction of this action under the Class Action Fairness Act of 2005. Pursuant to 28 U.S.C. § 1332(d), this Court has original jurisdiction because

    a.    the proposed Class is comprised of at least 100 members; § 1332(d)(5)(B)

    b.    at least one member of the proposed class is a citizen of a State other than the State of which Stack Sports is a citizen, § 1332(d)(2)(A); and

    c.    the aggregate claims of the putative class members exceed $5 million, exclusive of interest and costs. § 1332(d)(2), (6).

18.    Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Stack Sports is subject to personal jurisdiction here and regularly conducts business in this District, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this district.

## FACTUAL BACKGROUND AND GENERAL ALLEGATIONS

### A.    Overview of Stack Sports' Sports Connect Software

19.    Society recognizes participation in youth sports as an important component of raising physically and mentally healthy children.

20.    According to the Aspen Institute's Project Play Annual Report for 2023, children who are physically active reported more excitement, happiness and motivation, and those who are inactive reported greater nervousness, anxiety, worry and depression.  See Aspen Institute, State of Play 2023 Report, available at https://projectplay.org/state-of-play-2023/health-trends.

21.    Due to the high cost of youth sports, low-income families struggle to afford the costs to participate. Half of survey respondents who played youth sports or who have children who have played said they have struggled to afford the costs to participate. The issue impacts a broad swath of Americans of all backgrounds, including 66% who are Latino/a, 62% of 35-49-year-olds, 58% of those with high school educations, and 57% of lower-income adults. See Aspen Institute, State of Play 2023 Report, available at https://projectplay.org/state-of-play-2023/costs-to-play-trends.

22.    Through its deceptive late addition of a so-called "Service Fee", Stack Sports unfairly increases costs for those already struggling to afford the benefits of youth sports.

23.    Defendant Stack Sports offers its technology service, Sports Connect, to youth sports organizations. At issue in this complaint is Sport's Connect player registration technology service.

24.    Prior to becoming Sports Connect, Stack Sports acquired its youth sports technology competitors, Blue Sombrero and Affinity Sports.

25.     The Sports Connect software is used by sports organizations across the country as a tool to register for children for youth sports including but not limited to soccer, baseball, softball, football, flag football, basketball, volleyball, hockey, lacrosse, sports camps, and wrestling.

26.     Registration for sports is not completed via Sports Connect's direct website. Instead, the consumer registers for the sport using the website of the league that they are registering for, which is powered by Sports Connect.

27.     When a consumer registers their child for a sport using software provided by Sports Connect, the consumer must create an account that is powered by Sports Connect software. In order to do so, the consumer enters in their name and contact information.

28.     Consumers do not affirmatively agree to any terms of service with Sports Connect when registering for sports.

**B.**     **Sports Connect Markets Services to Youth Sports Organizations**

29.     Youth sports organizations engage Sports Connect to manage registration for their members.

30.     Sports Connect markets heavily to such organizations, promising ease and convenience for the youth sports organization, including online and electronic management of registration and payments.

31.     Youth sports organizations pay Sports Connect for these services, usually in the form of an annual subscription and payment processing charges.

32.     Youth sports organizations are not reasonably informed that Sports Connect will assess their registrants *additional* junk fees for using the very service the youth sports organization is already paying Sports Connect for.

33.     Once engaged by the youth sports organization, sign ups and communications for that organization then occur on the Sports Connect platform.

C.     **Consumer Registration Process**.

34.     Sports Connect charges consumers a hidden Service Fee beyond the advertised price of the sport. The hidden Service Fee is not disclosed when the initial sport price is displayed. In fact, Sports Connect does not disclose the Service Fee to consumers until the very last step in the purchase – after the consumer has already gone through several steps to commit to the purchase of registering for the youth sport.

35.     To make matters worse, even at the point of purchase, Sports Connect still does not disclose the purpose of the Service Fee. That is, of course, because the Service Fee has no real purpose where the Sports league itself is paying for use of Sports Connect software. The Service Fee is not tethered to any actual service or expense. Instead, the Service Fee is a pure profit-generator.

36.     Sports Connect itself admits that there is no real reason for the fee, other than that its competitors engage in the same avaricious behavior:

## Q: How does the service fee work?

The $3 service fee per transaction is new following the recent acquisition by Stack Sports. It is common across the industry for service providers to charge fees. The benefit of the Sports Connect pricing model is that it is $3 fee *per transaction*, as opposed to a $3 per player per activity fee (which is generally what is charged by other providers). This means parents who are signing up multiple children will only need to pay the service fee once upon checkout. Please note that with automatic recurring billing plans the service fee will be charged per transaction. For paper registrations with a check or cash payment, the $3 service fee will still apply and will be deducted from weekly disbursement to the league.

*See* https://sportsconnect.com/pricing-faq/ (last visited March 15, 2024).

37.     Here is how Sports Connect's deception works: When registering a child for youth sports, consumers must create an account. Then, consumers input their child's personal information, their child's team preferences, and decided whether to purchase gear. Throughout that process, a single price for the youth sport is displayed. After the consumer navigates this multi-step series of screens, the consumer is presented with a screen that purports to show the "Total Due Today".



38.     Moreover, throughout the registration process, when the consumer clicks on their online "cart", the price displayed does not include a "Service Fee".

39.     Only at the very end of the registration process are consumers, for the very first time and hidden as a line item, informed of the "Service Fee":




40.     Thus, by the time consumers are confronted with a total price that includes the added Service Fee, consumers have already taken several steps to commit to the transaction including creating account, inputting personal information about their children, inputting team preferences and playing positions, and deciding whether to purchase sport related gear.

41.     The "Service Fee" is never reasonably disclosed to consumers until it shows up as a line item on their receipts—after the purchase is largely complete. This process fails to provide an adequate advance warning to customers that a Service Fee will be imposed on their purchases.

     **D.     <u>The Service Fee is a Junk Fee That Violates Federal Guidance</u>.**

42.     Sports Connect's Service Fee is precisely the type of "Junk Fee" that has come under government scrutiny in recent years:

> Junk fees are fees that are mandatory but not transparently disclosed to consumers. Consumers are lured in with the promise of a low price, but when they get to the register, they discover that price was never really available. Junk fees harm consumers and actively undermine competition by making it impractical for consumers to compare prices, a linchpin of our economic system.

The White House, <u>The Price Isn't Right: How Junk Fees Cost Consumers and Undermine Competition</u>, March 5, 2024, available at https://www.whitehouse.gov/cea/written-materials/2024/03/05/the-price-isnt-right-how-junk-fees-cost-consumers-and-undermine-competition/#_ftnref3

43.     As the Federal Trade Commission said recently in its effort to combat Junk Fees,

[M]any consumers said that sellers often do not advertise the total amount they will have to pay, and disclose fees only after they are well into completing the transaction. They also said that sellers often misrepresent or do not adequately disclose the nature or purpose of certain fees, leaving consumers wondering what they are paying for or if they are getting anything at all for the fee charged.

Federal Trade Commission, <u>FTC Proposes Rule to Ban Junk Fees – Proposed rule would prohibit hidden and falsely advertised fees</u>, , October 11, 2023, available at <u>https://www.ftc.gov/news-events/news/press-releases/2023/10/ftc-proposes-rule-ban-junk-fees</u>.

44.     In its own effort to combat junk fees, the State of New York recently passed N.Y. Arts & Cult. Aff. Law § 25.07 concerning fees associated with tickets to sports and concerts. Under that law, "[t]he price of the ticket shall not increase during the purchase process, excluding reasonable fees for the delivery of non-electronic tickets based on the delivery method selected by the purchaser, which shall be disclosed prior to accepting payment therefor." N.Y. Arts & Cult. Aff. Law § 25.07(4). Accordingly, if the consumer selects to purchase a ticket electronically, at the start of the transaction, the total ticket price shall not increase during the period it takes the consumer to purchase the ticket (e.g., finish the online transaction).  The "All-In Price" must be disclosed to the consumer before the consumer selects the ticket for purchase. Similarly here, the "All-In Price" should have been displayed to the consumer throughout the enrollment process.

45.      In its 2013 publication ".com Disclosures: How to Make Effective Disclosures in Digital Advertising, the FTC makes clear that when advertising and selling are combined on a

website, and the consumer will be completing the transaction online, the disclosures should be provided before the consumer makes the decision to buy – for example, before the consumer "add[s] to shopping cart." See Fed. Trade Comm'n, .com Disclosures: How to Make Effective Disclosures iN Digital Advertising at ii, 14 (Mar. 2013), available at https://www.ftc.gov/sites/default/files/attachments/press-releases/ftc-staff-revises-online-advertising-disclosure-guidelines/130312dotcomdisclosures.pdf

46. Defendant violates federal guidance by adding the Service Fee as a line item well after the consumer "add[s] to shopping cart", and by failing to disclose the nature of the Service Fee and whether consumers are getting any benefit at all from the fee charged. Worse yet, there is no actual "Service" performed where the youth sports league itself pay for Sports Connects service.

47. The Service Fee provides no additional value to consumer not already paid for by the league they are signing up for.

48. The Service Fee itself is a sham, a classic "junk fee." The service provided by Sports Connect, which is signing up for and managing communications regarding youth sports online, is a "service" that the youth sports leagues are already paying Defendant for. There is no additional service provide to parents or guardians who register. The Service Fee is merely a second payment—in the form of a junk fee—for the "Service" that the sports leagues are already paying for. Indeed, prior to 2020, Sports Connect did not charge any Service Fee, until being acquired by a new company.

49. Parents or guardians of youth players are then instructed that they *must* use Sports Connect service to register their children in the organization's sports offerings. Sports Connect prohibits parents or guardians from signing up in alternative manners that would allow them to

11

avoid paying the service fee. Through such agreements, Sports Connect acquires a captive audience of families who have no choice but to use their services.

50.     Defendant imposes undisclosed, deceptive, and unfair junk fees on families who have no choice but to pay them. By this conduct, Sports Connect has engineered a "pay junk fees to play" scheme. Kids can't play their chosen youth sports unless their parents pay the junk fee unilaterally set by Defendant with zero relationship to the service actually being provided.

       **E.**    **<u>Plaintiff Buffington's Experience</u>**

51.     On February 26, 2022, Plaintiff Buffington registered his child to play flag football through youth sports organization Old Skewl Sports.

52.     At the time he completed the registration, the Service Fee was hidden and not displayed until the ordering process was substantially complete.

53.     Had Defendant disclosed the Service Fee at an earlier time in the enrollment process, and disclosed the nature of the Service Fee, Plaintiff Buffington may have made a different choice with respect to whether to use Sports Connect to enroll in the youth sport  and would have inquired with the league regarding registration by alternate means.

54.     On December 28, 2021, Plaintiff Buffington registered his child for baseball through youth sports organization Otisville Little League.

55.     At the time he completed the registration, the Service Fee was hidden and not displayed until the ordering process was substantially complete.

56.     Had Defendant disclosed the Service Fee at an earlier time in the enrollment process, and disclosed the nature of the Service Fee, Plaintiff Buffington may have made a different choice with respect to whether to use Sports Connect to enroll in the youth sport and would have inquired with the league regarding registration by alternate means.

### F.    Plaintiff Craig's Experience

57.    On or about October of 2023, Plaintiff Craig registered her child to play flag football through youth sports organization NFL Flag Football.

58.    At the time she completed the registration, the Service Fee was hidden and not displayed until the ordering process was substantially complete.

59.    Had Defendant disclosed the Service Fee at an earlier time in the enrollment process, and disclosed the nature of the Service Fee, Plaintiff Craig may have made a different choice with respect to whether to use Sports Connect to enroll in the youth sport and would have inquired with the league regarding registration by alternate means.

60.    Also, because Plaintiff Craig elected to make two payments to cover the cost of the flag football season, Plaintiff Craig was charged two $3.00 service fees.

### G.    Plaintiff Helmold's Experience

61.    On or about February 8, 2024, Plaintiff Helmold registered her children to play baseball through Kennedy Park Little League.

62.    At the time she completed the registration, the Service Fee was hidden and not displayed until the ordering process was substantially complete.

63.    Had Defendant disclosed the Service Fee at an earlier time in the enrollment process, and disclosed the nature of the Service Fee, Plaintiff Buffington may have made a different choice with respect to whether to use Sports Connect to enroll in the youth sport and would have inquired with the league regarding registration by alternate means.

64.    On or about March 4, 2024, Plaintiff Helmold registered her children to play soccer through St. Cajetan Grammar School Athletics.

65.    At the time she completed the registration, the Service Fee was hidden and not displayed until the ordering process was substantially complete.

66.    Had Defendant disclosed the Service Fee at an earlier time in the enrollment process, and disclosed the nature of the Service Fee, Plaintiff Buffington may have made a different choice with respect to whether to use Sports Connect to enroll in the youth sport and would have inquired with the league regarding registration by alternate means.

### H.    Plaintiff Kramer's Experience

67.    On or about February 11, 2024, Plaintiff Kramer registered her children to play softball through youth sports organization Sergeant Bluff Girls Softball.

68.    At the time she completed the registration, the Service Fee was hidden and not displayed until the ordering process was substantially complete.

69.    Had Defendant disclosed the Service Fee at an earlier time in the enrollment process, and disclosed the nature of the Service Fee, Plaintiff Kramer may have made a different choice with respect to whether to use Sports Connect to enroll in the youth sport and would have inquired with the league regarding registration by alternate means.

### CLASS ALLEGATIONS

70.    Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure as defined as follows (and hereafter referred to as "Class" or "Nationwide Class"):

> All persons who, during the applicable statute of limitations, were charged a
> Service Fee by Defendant.

71.    Plaintiffs also bring alternative state subclasses on behalf of New York, Florida, Illinois, and Iowa residents.

72.     The Nationwide Class and alternative state subclasses defined above are collectively referred to herein as the "Classes." Plaintiffs reserve the right to modify or amend the definitions of the proposed Classes before the Court determines whether certification is appropriate.

73.     Excluded from the Classes are Defendant, its consumers, subsidiaries, affiliates, officers and directors, any entity in which Defendant has a controlling interest, all personal accountholders who make a timely election to be excluded, governmental entities, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

74.     This action satisfies the numerosity, commonality, typicality, adequacy, predominance and superiority requirements.

75.     The members of the Classes are so numerous that joinder is impractical.  The Classes consist of at least thousands of members, the identity of whom is within the knowledge of, and can be ascertained only by resort to, Defendant's records.

76.     The claims of the representative Plaintiffs are typical of the claims of the Classes they seek to represent in that the representative Plaintiffs, like all members of the Classes, were charged improper and deceptive fees as alleged herein. The representative Plaintiffs, like all members of the Classes, were damaged by Defendant's misconduct in that they were charged hidden service fees. Furthermore, the factual basis of Defendant's misconduct is common to all members of the Classes and represents a common thread of unfair and unconscionable conduct resulting in injury to all members of the Classes. And Defendant has no unique defenses that would apply to Plaintiffs and not the Classes.

77.    There are numerous questions of law and fact common to the Classes and those common questions predominate over any questions affecting only individual members of the Classes.

78.    The questions of law and fact common to the Classes include, but are not limited to, the following:

a.    Whether Defendant's assessment of Service Fees was unfair, deceptive, or misleading;

b.    The proper method or methods by which to measure damages and/or restitution and/or disgorgement; and

c.    Whether Plaintiffs and the Classes are entitled to declaratory and injunctive relief and the nature of that relief.

79.    Plaintiffs' claims are typical of the claims of other members of the Classes, in that they arise out of the same wrongful Service Fee policies and practices. Plaintiffs have suffered the harm alleged and has no interests antagonistic to the interests of any other member of the Classes.

80.    Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel experienced in the prosecution of class actions and, in particular, consumer class actions against financial institutions.  Accordingly, Plaintiffs are adequate representatives and will fairly and adequately protect the interests of the Classes.

81.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the amount of each individual member of the Classes' claim is small relative to the complexity of the litigation, and due to the financial resources of Defendant, no member of the Classes could afford to seek legal redress individually for the claims alleged herein.  Therefore, absent a class action, the members of the Classes will continue to suffer

16

losses and Defendant's misconduct will proceed without remedy.

82.    Even if members of the Classes themselves could afford such individual litigation, the court system could not. Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale and comprehensive supervision by a single court.

83.    Plaintiffs know of no difficulty to be encountered in the maintenance of this action that would preclude its treatment as a class action.

84.    Defendant has acted or refused to act on grounds generally applicable to each of the Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to each Classes as a whole.

85.    All conditions precedent to bringing this action have been satisfied and/or waived.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### Deceptive Acts or Practices – N.Y. Gen. Bus. Law § 349
### (On Behalf of Plaintiff Buffington and the New York Subclass)

86.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

87.    This cause of action is asserted on behalf of the New York Subclass, whose members enjoy the protections of Article 22-A of the New York General Business Law, the Consumer Protection from Deceptive Acts and Practices Law, N.Y. GEN. BUS. LAW § 349 *et seq.*,

which prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service." N.Y. GEN. BUS. LAW § 349(a).

88. Defendant's policies and practices complained of herein were and are consumer-oriented, in that they affect all consumers who maintain checking accounts with Defendant.

89. The complained-of policies and practices were and are misleading in a material respect, because Defendant hid its Service Fee until the very end of the registration process, often causing consumers to miss its assessment entirely. Moreover, consumers are not getting any actual "service" where the youth league itself is paying for Sports Connect's service.

90. Had Plaintiff Buffington and the other members of the New York Subclass known they could be charged Services Fees, they may have made different purchasing decisions.

91. Plaintiff Buffington and the other members of the New York Subclasses were injured as a result of Defendant's policies and practices, in that they paid the Service Fees.

92. Defendant's actions were willful and knowing.

93. As redress for Defendant's repeated and ongoing violations of these consumer protection statutes, Plaintiff Buffington and the other members of the New York Subclass each seek actual damages, treble damages, statutory damages, injunctive relief, and attorney's fees and costs.

**SECOND CLAIM FOR RELIEF**
**False Advertising – N.Y. Gen. Bus. Law § 350**
**(On Behalf of Plaintiff Buffington and the New York Subclass)**

94. The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

95. N.Y. Gen. Bus. Law § 350 provides that "False advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared

18

unlawful."

96.    Defendant's actions regarding the Service Fee, as described herein, constitute false advertising in the conduct of the business trade or commerce of youth sports.

97.    Defendant's false advertising took place in this State because Defendant operates in this State, and because Plaintiff Buffington's transactions with Defendant took place in this state.

98.    Plaintiff Buffington and the other New York Subclass members have been injured by Defendant's violations of N.Y. Gen. Bus. Law § 350.

99.    Defendant's false advertising occurred, and continues to occur, in the course of Defendant's business.

100.    As an actual and proximate result of Defendant's misconduct, Plaintiff Buffington and the other New York Subclass members were injured and suffered damages.

101.    Defendant is liable to Plaintiff Buffington and the other New York Subclass members for damages in amounts to be proven at trial.

### THIRD CLAIM FOR RELIEF
### Unjust Enrichment
### (On behalf all Plaintiffs and the Nationwide Class)

102.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

103.    To the detriment of Plaintiffs and the Class, Defendant has been, and continues to be, unjustly enriched as a result of its wrongful conduct alleged herein.

104.    Plaintiffs and the Class conferred a benefit on Defendant when they paid Defendant the Service Fee, which they did not agree to and could not reasonably avoid.

105.    Defendant unfairly, deceptively, unjustly, and/or unlawfully accepted said benefits,

which under the circumstances, would be unjust to allow Defendant to retain.

106.    Defendant's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

107.    Plaintiff and the Class, therefore, seek disgorgement of all wrongfully obtained fees received by Defendant as a result of its inequitable conduct as more fully stated herein.

**FOURTH CLAIM FOR RELIEF**
**Violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"),**
**(Fla. Stat. § 501.201, et seq.)**
**(On Behalf of Plaintiff Craig and the Florida Subclass)**

108.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

109.    This cause of action is brought under Florida's Deceptive and Unfair Trade Practices Act § 501.201, *et seq*.

110.    The stated purpose of the FDUTPA is to "protect the consuming public … from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2).

111.    Plaintiff Craig and members of the Florida Subclass are "consumers" as defined by Fla. Stat. § 501.203(7).

112.    Defendant engaged in "trade or commerce" as defined by Fla. Stat. § 501.203(8) by providing youth sports registration software to recreational leagues.

113.    Defendant committed deceptive acts and practices in violation of the FDUTPA by affirmatively and knowingly misrepresenting its Service Fees, as alleged herein.

114.    Defendant's actions regarding its cancellation process, as described herein, are deceptive acts or practices in the conduct of business, trade, or commerce of goods.

115.    Fla. Stat. § 501.211(2) provides that any action brought by a person who has suffered

a loss as a result of a violation of this part, such person may recover actual damages, plus attorney's fees and court costs as provided in s. 501.2105.

116.    Defendant intentionally and knowingly engaged in these unlawful practices. Defendant intentionally misled Plaintiff Craig and the other Florida Subclass members into paying a Service Fee, as described herein.

117.    Defendant's misleading and deceptive conduct regarding its cancellations is a practice that is likely to mislead a consumer acting reasonably under the circumstances, to the consumer's detriment.

118.    Had Plaintiff Craig known she would incur a Service Fee, she would have made different decisions regarding payment for youth sports.

119.    As a direct and proximate result of Defendant's misconduct, Plaintiff Craig and the other Florida Subclass Members were injured and suffered actual damages.

120.    Accordingly, Defendant is liable to Plaintiff and the Florida subclass members for damages in amounts to be proven at trial.

**FIFTH CLAIM FOR RELIEF**
**Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act,**
**815 ILCS 505/1, et seq.**
**(on behalf of Plaintiff Helmold and the Illinois  Subclass)**

121.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

122.    Defendant has violated the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1, *et seq*.

123.    Section 2 of the ICFA, 815 ILCS 505/2, provides:

> Unfair methods of competition and unfair or deceptive acts or practices,
> including but not limited to the use or employment of any deception, fraud,
> false pretense, false promise, misrepresentation or the concealment,

suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act.

124.    Section 10a of the ICFA, provides in relevant part:

(a) Any person who suffers actual damage as a result of a violation of this Act committed by any other person may bring an action against such person. The court, in its discretion may award actual economic damages or any other relief which the court deems proper . . .

. . .

(c) . . . [I]n any action brought by a person under this Section, the Court may grant injunctive relief where appropriate and may award, in addition to the relief provided in this Section, reasonable attorney's fees and costs to the prevailing party.

815 ILCS 505/10A(a).

125.    Plaintiff and other members of the Illinois Subclass are "consumers" or "persons," as defined under the ICFA, 815 ILCS 505/1 *et seq*.

126.    Defendant's conduct, as alleged herein, occurred in the course of trade and commerce.

127.    Defendant knowingly and intentionally employed an unfair and deceptive policy and practice of charging Service Fees and failing to fairly disclose the presence and nature of those Service Fees.

128.    Defendant's statements and omissions to Plaintiff Helmold and the Illinois Subclass were material and were likely to mislead Plaintiff Helmold and members of the Illinois Subclass, and, in fact, did mislead Plaintiff Helmold and the Illinois Subclass.

129.     Plaintiff Helmold relied on Defendant's misrepresentations as discussed above.

130.     Defendant made these statements and omissions with the intent that Plaintiff Helmold and the Illinois Subclass members would rely on them.

131.     Defendant's conduct described herein constitutes unfair and deceptive acts or practices in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act.

132.     As a direct and proximate result of Defendant's conduct, Plaintiff Helmold and members of the Illinois Subclass have suffered actual damages.

**SIXTH CLAIM FOR RELIEF**
**Violation of the Iowa Consumer Fraud Act, Iowa Code § 714.16**
**(on behalf of Plaintiff Kramer and the Iowa Subclass)**

133.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

134.     The Iowa Consumer Fraud Act, Iowa Code§ 714.16 (2)(a) ("the Consumer Fraud Act") provides in pertinent part:

> The act, use or employment by a person of an unfair practice, deception, fraud, false pretense, false promise, or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon the concealment, suppression, or omission, in connection with the lease, sale, or advertisement of any merchandise or the solicitation of contributions for charitable purposes, whether or not a person has in fact been misled, deceived, or damaged, is an unlawful practice.

135.     Defendant has committed a "Deception" as defined by Iowa Code § 714.16(1) because the Act of charging a Service Fee where no additional Service is performed, and concealing such fee as described herein, has the tendency or capacity to mislead a substantial number of consumers as to a material fact or fact.

136.     Defendant has committed an "Unfair practice" as defined by Iowa Code § 714.16(1) because Defendant's Service Fee causes substantial, unavoidable injury to

consumers that is not outweighed by any consumer or competitive benefits which the practice produces.

137.    As a direct and proximate result of Defendant's conduct, Plaintiff Kramer and the other members of the Iowa Subclass have suffered actual damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the members of the Class seek an Order:

1.    Certifying the proposed Classes pursuant to Rule 23;

2.    Declaring that Defendant is financially responsible for notifying the Class members of the pendency of this suit;

3.    Declaring the Defendant has committed the violations of law alleged herein;

4.    Providing for any and all injunctive relief the Court deems appropriate;

5.    Awarding statutory damages in the maximum amount for which the law provides;

6.    Awarding monetary damages, including but not limited to any compensatory, incidental, or consequential damages in an amount that the Court or jury will determine, in accordance with applicable law;

7.    Providing for any and all equitable monetary relief the Court deems appropriate;

8.    Awarding punitive or exemplary damages in accordance with proof and in an amount consistent with applicable precedent;

9.    Awarding Plaintiffs their reasonable costs and expenses of suit, including attorneys' fees;

10.    Awarding pre- and post-judgment interest to the extent the law allows; and

11.    Providing such further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs respectfully demand a trial by jury on all issues so triable.

Dated: April 3, 2024                           Respectfully submitted,

**REESE LLP**

*/s/ Michael R. Reese*
Michael R. Reese
100 West 93rd Street, 16th Floor
New York, New York 10025
Tel: (212) 643-0500
*mreese@reesellp.com*

Jeffrey D. Kaliel
**KALIELGOLD PLLC**
1100 15th Street NW, 4th Floor
Washington, D.C. 20005
Tel: (202) 350-4783
*jkaliel@kalielpllc.com*

Sophia Goren Gold
**KALIELGOLD PLLC**
950 Gilman Street, Suite 200
Berkeley, CA 94710
Tel: (202) 350-4783
*sgold@kalielgold.com*

*Counsel for Plaintiffs and the Proposed Classes*